UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JAMES H. KIRBY, III,

                Plaintiff,               CIVIL ACTION NO. 09-14208

        v.                       DISTRICT JUDGE AVERN COHN

COMMISSIONER OF             MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## I.    PROCEDURAL HISTORY

### A.    *Proceedings in this Court*

On October 27, 2009, Plaintiff filed the instant suit seeking judicial review of the

Commissioner's decision disallowing benefits (Dkt. No.1). Pursuant to 28 U.S.C. § 636(b)(1)(B)

and Local Rule 72.1(b)(3), this matter was referred to the undersigned for the purpose of

reviewing the Commissioner's decision denying Plaintiff's claim for a period of

Disability Insurance and Supplemental Security Income benefits (Dkt. No. 3). This matter is

currently before the Court on cross-motions for summary judgment (Dkt. Nos. 16, 17).

### B.    *Administrative Proceedings*

Plaintiff filed the instant claims on December 5, 2006, alleging that he became unable to

work on October 20, 2004 (Tr. 116-119, 120-123). The claim was initially disapproved by the

Commissioner on February 21, 2007 (Tr. 50-54, 55-58). Plaintiff requested a hearing and, on

April 7, 2009, Plaintiff appeared with counsel before Administrative Law Judge (ALJ) Ethel

Revels, who considered the case *de novo*. In a decision dated May 28, 2009, the ALJ found that Plaintiff was not disabled (Tr. 7-20). Plaintiff requested a review of this decision on July 1, 2009 (Tr. 5). The ALJ's decision became the final decision of the Commissioner when the Appeals Council, on September 23, 2009, denied Plaintiff's request for review (Tr. 1-4).

In light of the entire record in this case, I find that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    STATEMENT OF FACTS

### A.      *ALJ Findings*

Plaintiff was 35 years old at the time of the most recent administrative hearing, and was 30 years old on his alleged onset date of disability (Tr. 12). Plaintiff has past relevant work as a packer, a hi-lo driver, a material handler and a cleaner (Tr. 18). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since October 20, 2004, Plaintiff's alleged disability onset date (Tr. 12). At step two, the ALJ found that Plaintiff had the following "severe" impairments: degenerative disc disease, obesity, depression, a learning disability and essential hypertension. *Id*. At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations (Tr. 13).

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity (RFC) to perform "sedentary work...except lifting up to 10 pounds occasionally and less than 10 pounds frequently; due to [Plaintiff's] limited ability to stand, a sit/stand option with

standing limited to 10 minutes at a time; no work in temperature extremes; no bending; no operating in humid areas; no use of vibrating tools; because of the symptoms of pain, [Plaintiff] has a moderate limitation in his ability to maintain concentration for extended periods, therefore work should be simple, repetitive tasks; and because of [Plaintiff's] depression, he has a moderate limitation in his ability to understand, remember and carry out detailed instructions, therefore work should be routine" (Tr. 14). At step four, the ALJ found that Plaintiff could not perform his previous work as a packer, a hi-lo driver, a material handler or cleaner (Tr. 18). At step five, the ALJ denied Plaintiff benefits, because the ALJ found that Plaintiff could perform a significant number of jobs available in the national economy, such as sorter (1,200 local jobs), bench assembler (3,000 local jobs) or surveillance systems monitor (1,600 local jobs) (Tr. 19).

### B.    *Administrative Record*

#### 1.    **Plaintiff's Testimony and Statements**

Plaintiff testified that he had back and knee pain and was "depressed all the time" (Tr. 26-27). He stated that he could walk one-half of a block and stand for ten minutes (Tr. 27). Plaintiff testified that he reclined to alleviate his symptoms and had difficulty sleeping (Tr. 29). Plaintiff stated that, on a good day, his pain ranged from five to six out of ten (ten being the most severe) and that it was between seven and eight on a bad day (Tr. 31). Plaintiff testified that he had difficulty with concentration due to racing thoughts (Tr. 32). Plaintiff further testified that he spent most of the day in bed approximately four days a week and his mother went shopping for him because he could not walk for more than 15 minutes (Tr. 31). Plaintiff stated that he worked for Frito-Lay until October 2004 when the factory closed (Tr. 35). He testified that he worked at another job after that as a "high-low" operator, but was unable to maintain employment due to pain (Tr. 35-36).

Plaintiff reported that he had no difficulty with personal care (Tr. 139). Plaintiff reported that he made simple meals, cleaned laundry, drove a car, went shopping for 20 to 30 minutes at a time, and washed dishes, although he had difficulty washing dishes due to his difficulty standing (Tr. 139-41). Plaintiff stated that he talked on the telephone with his family, watched his nephew play baseball, and helped his niece and nephew with homework (Tr. 138, 142).

## 2. Medical Evidence

In April 2003, Plaintiff complained to Dr. Sakka of lower back pain, Dr. Sakka prescribed Vicodin (pain medication) and Soma (muscle relaxant) and recommended an MRI and physical therapy (Tr. 327). A lumbar spine MRI performed three days later revealed a focal disc protrusion at L4-L5 with an annular tear resulting in mild to moderate spinal canal stenosis (narrowing) (Tr. 325-26). Plaintiff presented to Dr. Sakka eight more times between April 2003 and March 2004 for treatment of lower back pain radiating down his legs; Dr. Sakka again prescribed Soma and Vicodin (Tr. 317-24).

In May 2004, Plaintiff presented to Dr. Suleiman, an orthopedic surgeon, with complaints of lower back pain radiating down to both knees and numbness radiating to his feet (Tr. 316). Plaintiff had a normal gait with some pain on heel and toe walking; a limited range of lumbar spine motion; paraspinal tenderness; and bilateral positive straight leg raising tests (Tr. 316). Dr. Suleiman prescribed Bextra (anti-inflammatory) and Flexeril (muscle relaxant) and recommended limited activity for one month and physical therapy (Tr. 316). Plaintiff attended physical therapy beginning in May 2004, which was discontinued in September 2004, due to noncompliance (Tr. 259-74).

Plaintiff presented to Dr. Suleiman once a month between June and October 2004 with complaints of lower back pain (Tr. 236-39, 241). Plaintiff displayed symptoms such as a limited

range of spinal motion and paraspinal tenderness (Tr. 236-39, 241). Dr. Suleiman prescribed Arthrotec (anti-inflammatory drug), Darvocet (pain medication), and Soma (Tr. 236-39, 241). In August 2004, Dr. Suleiman performed arthrocentesis (aspiration of joint fluid) and an injection into Plaintiff's SI joint (Tr. 237). In September 2004, Dr. Suleiman noted that a recent lumbar spine MRI (Tr. 251-52) showed no significant differences from the prior MRI (Tr. 236). The next month, Plaintiff reported significant pain while walking and he had paraspinal tenderness, however his range of motion was normal and straight leg raising tests were negative (Tr. 241). Dr. Suleiman recommended that Plaintiff undergo injections (Tr. 241). The same month, Dr. Sakka prescribed Soma and Vicodin (Tr. 313). Dr. Sakka also diagnosed anxiety and prescribed Xanax (Tr. 313).

Plaintiff presented to Dr. Rehman four times between November 2004 and January 2005 for trigger point and interspinous ligament injections to treat lower back pain and aching pain in his thighs; Dr. Rehman also prescribed Darvocet and Soma (Tr. 242-45). Plaintiff reported that the injections helped from a few days to a few weeks (Tr. 242-45). Dr. Rehman diagnosed lumbar radiculitis, bilateral sacroiliac strain, and lumbar facet arthritis (Tr. 242-45). Plaintiff displayed lumbar paraspinal tenderness with trigger points, tenderness in interspinous ligaments, pain on lumbar extension, and a positive Patrick's test (test for sacroiliitis), however straight leg raising tests were negative (Tr. 242). In January 2005, Dr. Rehman recommended epidural steroid injections (Tr. 245).

Plaintiff presented to Dr. Sakka roughly once a month between November 2004 and February 2007 for treatment of anxiety and back pain (Tr. 282-311). Dr. Sakka made almost no treatment notes during most appointments and did not vary Plaintiff's medications, which included Vicodin, Soma, and Xanax (Tr. 282-311).

In February 2007, Dr. Edmond examined Plaintiff for the state Disability Determination Service (DDS) (Tr. 231-35). Plaintiff complained of lower back and thigh pain for the last year and stated that the pain radiated down both legs causing aching in his feet and tingling in his feet and legs (Tr. 232). Plaintiff also complained of neck pain and stiffness with tingling in his upper arms (Tr. 232). Plaintiff reported that he could walk for one-half block before stopping due to leg pain and that he had stiffness and poor balance (Tr. 232). Dr. Edmond noted that Plaintiff was overweight and ambulated with a slight tilt to his trunk and a slightly slow heel, toe sequence (Tr. 232). Plaintiff was slow to rise from sitting and could stand on his heels, but reported pain when standing on his toes (Tr. 232). Plaintiff could squat and recover using the table for assistance and could slowly tandem walk and stand on alternating legs (Tr. 232). Plaintiff was able to get onto and off of the examination table (Tr. 232). Plaintiff had a negative straight leg raising test and reduced lumbar spine motion with no spasms (Tr. 232, 234). Dr. Edmond opined that Plaintiff had lumbar spinal stenosis and noted that the fact that Plaintiff had new symptoms in an L5 distribution in addition to an L4 distribution suggested progression of the stenosis (Tr. 233). Dr. Edmond opined that Plaintiff was limited to simple activities of daily living and could open a jar, use buttons, write, tie his shoes, and pick up a coin (Tr. 233).

Later that month, Dr. Joh reviewed Plaintiff's records for the state DDS and assessed Plaintiff's physical abilities (Tr. 223-30). Dr. Joh opined that Plaintiff could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, and walk and stand or sit for six hours in an eight-hour workday (Tr. 224). Dr. Joh opined that Plaintiff could occasionally stoop, kneel, crawl, and climb ladders, ropes, scaffolds, ramps, and stairs (Tr. 225).

Plaintiff presented to Dr. Sakka seven times between March and September 2007 for treatment of back pain and anxiety (Tr. 275-81). Dr. Sakka included almost no examination

findings and continued Plaintiff's medications without variation (Tr. 275-81). Plaintiff presented to Dr. Sakka in December 2007 for treatment of chronic obstructive pulmonary disease (COPD), anxiety, and severe lower back pain radiating to both legs, causing depression (Tr. 349). Dr. Sakka noted that Plaintiff had lower back tenderness and mild wheezing and recommended that he stop smoking (Tr. 349). An MRI later that month revealed a moderate to severe central disc protrusion at L4-L5 resulting in effacement of the thecal sac (Tr. 222).

Plaintiff presented to Dr. Young twice in March 2008 with complaints of problems with his hips and legs (Tr. 217-18). Dr. Young prescribed medication, including Xanax and Vicodin, referred Plaintiff to a neurosurgeon, and initially discontinued Soma, but later replaced Xanax with Soma (Tr. 217-18).

Plaintiff presented to Dr. Claybrooks in April 2008 with complaints of leg pain and central, bilateral lumbar spinal pain with the right worse than the left aggravated by sitting, walking, standing, bending, twisting, and rolling over (Tr. 219). Plaintiff reported that it was relieved by medications and sitting on a recliner (Tr. 219). Plaintiff stated that he had leg weakness manifested by imbalance, falling, difficulties with stairs, and a subjective sense of giving way or wobbling (Tr. 219). Plaintiff reported that he could stand for 10 minutes, sit for 20 minutes, and walk for 10 minutes (Tr. 219). Plaintiff had an antalgic gait and was unable to toe, heel, and tandem walk (Tr. 220). He had a normal range of lumbar spine motion; normal strength, reflexes, and sensation in his lower extremities; and negative straight leg raising tests (Tr. 220). Dr. Claybrooks diagnosed degenerative disc disease and epidural lipomatosis (multiple benign fatty tumors) from L3 to L5 and central disc herniation at L4-L5, and recommended a discogram to determine the source of his pain (Tr. 221). Plaintiff presented to

Dr. Young later that month and Dr. Young prescribed Xanax and recommended a pain management consultation (Tr. 216).

Plaintiff presented to Dr. Young in May 2008 complaining of left knee burning pain and swelling, which Dr. Young suspected might be a meniscal tear and recommended an MRI (Tr. 337). The MRI revealed evidence of osteonecrosis (bone cell death) at the medial femoral epicondyle, but no meniscal tear (Tr. 335). Dr. Young opined the next month that Plaintiff had knee arthritis and prescribed Sulindac (osteoarthritis medication), Vicodin, and Vistaril (medication used to treat anxiety) (Tr. 334). Dr. Young recommended a consultation with an orthopaedic specialist, but Plaintiff had not done so as of July 2008 (Tr. 332-33).

In August 2008, Dr. Khoury evaluated Plaintiff's knee condition and found only slight pain on motion of the patella (Tr. 366). Dr. Khoury noted that a knee MRI was generally unremarkable and recommended a knee sleeve and home exercises (Tr. 366).

Dr. Perlson noted in September 2008 that Plaintiff had been recommended for back surgery, had seen a specialist regarding his knee condition, and intended to seek counseling for anxiety and depression (Tr. 330).

Plaintiff presented to Dr. Sudindramath twice in October and November 2008 for treatment of depression (Tr. 341-43). In October 2008, Dr. Sudindramath noted that Plaintiff had a depressed affect and mood, impaired concentration, mood swings, panic attacks, and crying spells, but that he denied hallucinations, paranoia, and suicidal and homicidal ideations (Tr. 342-43). Dr. Sudindramath diagnosed major depressive disorder and assessed a GAF[1] score of 43

---

[1] The GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 31-40 indicates some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood. A GAF of 41 to 50 means that the patient has serious symptoms . . . OR any serious

(serious symptoms); Dr. Sudindramath prescribed Lexapro (anti-depressant) the next month (Tr. 341, 343).

In December 2008, Dr. Young noted that Plaintiff complained of back, leg, and shoulder pain, but had a negative straight leg raising test (Tr. 329). Dr. Young indicated that he was issuing an opinion stating that Plaintiff could lift no more than 10 pounds and had limited sitting and standing (Tr. 329).

Plaintiff returned to Dr. Sudindramath in January 2009, and was prescribed Wellbutrin in place of Lexapro, due to adverse side-effects (Tr. 363).

### 3.  Vocational Expert

During the hearing, the ALJ asked the a vocational expert (VE) a hypothetical question regarding the existence of jobs for a person of Plaintiff's age, education and past relevant work experience, who could lift 10 pounds occasionally and less than ten pounds frequently with the additional limitation of only simple repetitive tasks "because there are moderate limitations and ability to maintain concentration for extended periods as well as to carry out detailed instructions because of pain and depression" (Tr. 42-43). The ALJ added additional limitations, including: must be allowed to sit or stand at will; no exposure to temperature extremes and humidity; no bending; and no vibrating tools (Tr. 42). The VE testified that such a person could work as a sorter (1,500 positions), bench assembler (3,000 positions) or surveillance system monitor (1,600 positions) (Tr. 43).

---

impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

### C.     Plaintiff's Claims of Error

Plaintiff raises three arguments on appeal, namely: (1) that the ALJ erred in finding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they conflicted with the RFC (Pl.'s Br. at 17-19); (2) that the hypothetical question posed by the ALJ to the vocational expert (VE) was flawed because it did not describe Plaintiff's difficulty concentrating, but rather simply contained a conclusion that Plaintiff retained the ability to perform simple, repetitive tasks (Pl.'s Br. at 21, 23-24); and (3) that it was improper for the ALJ to rely on the VE's testimony because there were inconsistences between the VE's testimony and the Dictionary of Occupational Titles (DOT) with regard to the position of surveillance system monitor (Pl.'s Br. at 24-25).

## III.    DISCUSSION

### A.     Standard of Review

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious. *See Sullivan v. Zebley*, 493 U.S. 521 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *See Bowen v. Yuckert*, 482 U.S. 137 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the

Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may...consider the credibility of a claimant when making a determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility.") (quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, *quoting*, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*). Substantial evidence is "more

than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800 F.2d at 545.

The scope of this Court's review is limited to an examination of the record only. *See Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *See Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. Appx. 521, 526 (6th Cir. 2006).

### B.     *Governing Law*

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed.Appx. 515, 524 (6th Cir. 2003). There are several benefits programs under the Act,

including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq*.)

and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq*.).

Title II benefits are available to qualifying wage earners who become disabled prior to the

expiration of their insured status; Title XVI benefits are available to poverty stricken adults and

children who become disabled.  F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984).

While the two programs have different eligibility requirements, "DIB and SSI are available only

for those who have a 'disability.'"  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).

"Disability" means:

> inability to engage in any substantial gainful activity by reason of
> any medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial
> gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or
> combination of impairments, that "significantly limits...physical or
> mental ability to do basic work activities," benefits are denied
> without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful
> activity, has a severe impairment that is expected to last for at least
> twelve months, and the severe impairment meets or equals one of
> the impairments listed in the regulations, the claimant is
> conclusively presumed to be disabled regardless of age, education
> or work experience.
>
> Step Four:  If the claimant is able to perform his or her past
> relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by his impairments and the fact that he is precluded from performing his past relevant work." *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540. If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

### C. *Analysis and Conclusions*

As noted earlier, Plaintiff raises three arguments on appeal. Each argument is discussed separately below:

1. **Substantial Evidence Supports the ALJ's Finding that Plaintiff's Statements Concerning the Intensity, Persistence, and Limiting Effects of His Symptoms Were Not Fully Credible.**

Plaintiff first argues that the ALJ erred in finding that his statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they conflicted with the residual functional capacity (RFC) (Pl.'s Brief at 17-19). Defendant responds

that the ALJ reasonably discounted Plaintiff's statements because Plaintiff's allegations of debilitating pain due to degenerative disc disease and knee conditions were inconsistent with observations and objective testing by medical sources; Plaintiff's treating physician effectively opined that he could perform sedentary work; and Plaintiff engaged in daily activities inconsistent with his claimed limitations (Tr. 18). Defendant also notes that the ALJ also appropriately discounted Plaintiff's statements with respect to the limiting effects of his mental condition, because they were inconsistent with his sporadic treatment history and his daily activities (Tr. 18). Defendant's arguments are well-taken.

As explained in *Jones v. Commissioner of Social Security*, 336 F.3d 469, 476 (6th 2003) "[a]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." An ALJ may appropriately discount a claimant's credibility when an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence. *Walters*, 127 F.3d at 531. Plaintiff's alleged physical and mental conditions are considered separately below:

### I) Plaintiff's Spine and Knee Conditions.

The ALJ found that Plaintiff's allegations of severe pain were inconsistent with medical records showing adequate range of motion and negative straight leg raising tests (Tr. 18). The ALJ specifically noted that if Plaintiff's back condition was deteriorating, there should be a corresponding decrease in his ability to perform straight leg raising tests, and to the contrary, his ability improved between 2004 and 2008 (Tr. 16). In May 2004, Dr. Suleiman examined Plaintiff due to complaints of back pain and found that he had a limited range of spinal motion and a bilateral positive straight leg raising test (Tr. 316). Plaintiff continued to display symptoms such as a limited range of spinal motion during monthly appointments with Dr. Suleiman

between June and September 2004 (Tr. 236-39). However, in October 2004, Dr. Suleiman found that although Plaintiff reported back pain, he had a full range of motion and a negative straight leg raising test (Tr. 241). Plaintiff presented to Dr. Rehman on four occasions between November 2004 and January 2005 for trigger point and interspinous injections, which Plaintiff reported did not help beyond a few weeks (Tr. 242-45). Although Plaintiff displayed several symptoms on examination during this period, including pain on extension, straight leg raising tests continued to be negative and he had a full range of motion on lumbar extension and lateral rotation (Tr. 242-45).

Plaintiff presented to Dr. Sakka roughly once a month between November 2004 and February 2007 for treatment of back pain, but Dr. Sakka made almost no treatment notes during most visits (Tr. 282-311). Plaintiff was examined by Dr. Edmond in February 2007, and although Plaintiff had a limited range of lumbar spine motion, he had no spasms and a negative straight leg raising test (Tr. 232, 234). Plaintiff presented to Dr. Sakka on numerous occasions between March and December 2007, but Dr. Sakka included almost no examination findings (Tr. 275-81, 349). In April 2008, Plaintiff presented to Dr. Claybrooks with complaints of leg pain and bilateral lumbar spine pain aggravated by numerous activities (Tr. 219). Although Plaintiff had difficulties walking, he had a normal range of lumbar spine motion and negative straight leg raising tests (Tr. 220). In December 2008, Plaintiff presented to Dr. Young with complaints including back and leg pain, however he had a negative straight leg raising test (Tr. 329). In sum, substantial evidence supports the ALJ finding that Plaintiff's allegations of severe pain were inconsistent with medical records showing some range of motion and negative straight leg raising tests (Tr. 18).

Plaintiff further testified that his left knee condition affected his ability to perform work-related activities (Tr. 26-27). However, as noted by the ALJ, objective tests by Dr. Young and consulting physicians refute this allegation (Tr. 18). Plaintiff presented to Dr. Young in May 2008, more than three-and-a-half years after his alleged onset of disability date, with complaints of left knee burning and swelling (Tr. 337). Although Dr. Young suspected a meniscal tear, an MRI revealed only osteonecrosis and Dr. Young opined that he had knee arthritis (Tr. 334-35, 337). A consulting doctor later noted that the MRI was generally unremarkable and, because Plaintiff did not have insurance to cover physical therapy, recommended a knee sleeve and home exercises (Tr. 366). Simply put, Plaintiff's limited treatment for his knee condition and generally unremarkable objective testing belies his claims of debilitating symptoms.

As noted by the ALJ, Plaintiff's allegations were directly contradicted by the opinion of his treating physician, Dr. Young (Tr. 18, 329). *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (Medical opinions from treating sources may be given significant, or even controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record.). In December 2008, Dr. Young indicated that he was issuing an opinion stating that Plaintiff could lift no more than 10 pounds and had limited sitting and standing (Tr. 329). As found by the ALJ, Dr. Young effectively found that Plaintiff was capable of sedentary work, which accords with the ALJ's RFC assessment of Plaintiff (Tr. 14, 18).

Furthermore, the ALJ also correctly found that Plaintiff's allegation of debilitating pain was contradicted by Plaintiff's reported activities. *See Bogle v. Sullivan*, 998 F.2d 342, 348 (6th Cir. 1993) (ALJ may consider household and social activities in evaluating complaints of disabling pain or other symptoms). Although Plaintiff reported on one occasion that he had

difficulty performing activities such as dressing, bathing, cooking, shopping, and driving (Tr. 185), he reported on another occasion that he: had no difficulty with personal care; made simple meals; cleaned laundry; drove a car; went shopping for 20 to 30 minutes at a time; and washed dishes, although he had difficulty washing dishes due to his difficulty standing (Tr. 139-41).

### ii)     Plaintiff's Mental Condition.

Plaintiff testified that he experienced difficulties due to constant racing thoughts and feelings of worthlessness (Tr. 31-32). However, as stated by the ALJ, Plaintiff's sporadic counseling indicates that his alleged mental limitations were overstated (Tr. 18). Indeed, the record contains very little evidence of treatment for mental conditions other than medication prescribed by Drs. Sakka and Young. Prior to October 2008, the only treatment Plaintiff received for a mental condition was a continuing prescription for Xanax from Drs. Sakka and Young (Tr. 216-18, 275-311, 313, 349). In October 2008, Plaintiff presented to Dr. Sudindramath specifically for treatment of depression and was prescribed additional medication (Tr. 342-43). However, the record only contains two other treatment notes from Dr. Sudindramath (Tr. 341, 363). Simply put, Plaintiff's limited treatment history for his mental condition belies his claims of debilitating symptoms.

The ALJ also found that Plaintiff's activities such as driving, cooking, and shopping were inconsistent with his claim that he had debilitating depression (Tr. 18). As discussed above, although Plaintiff stated on one occasion that he had difficulty performing daily activities, he reported on another occasion that he had no difficulty with personal care and performed chores, drove a car, and went shopping for 20 to 30 minutes at a time (Tr. 139-41). In addition, in discussing whether Plaintiff's mental condition met or equaled a listed impairment, the ALJ noted that Plaintiff had no difficulties in social functioning based on his reports that he talked on

the telephone with his family, watched his nephew play baseball, and helped his niece and nephew with homework (Tr. 13, 138, 142). In sum, the undersigned finds that substantial evidence supports the ALJ's finding that Plaintiff's statements regarding the effects of his mental conditions were less than fully credible (Tr. 18).

>              **2.    The ALJ's Hypothetical Question to**
>                     **the Vocational Expert Adequately Accounted**
>                     **for His Limitations.**

Plaintiff next claims that the hypothetical question posed to the vocational expert (VE) was flawed because it did not describe his difficulty concentrating, but rather simply contained a conclusion that he retained the ability to perform simple, repetitive tasks (Pl.'s Brief at 21, 23-24). Defendant responds that Plaintiff's argument is factually incorrect because the ALJ made the VE fully aware of Plaintiff's difficulty concentrating. Defendant is correct.

The ALJ asked the VE what work could be performed by a person who could only perform simple repetitive tasks "because there are moderate limitations and ability to maintain concentration for extended periods as well as to carry out detailed instructions because of pain and depression" (Tr. 42-43). Plaintiff cites several cases, such as *Edwards v. Barnhart*, 383 F.Supp.2d 920, 931 (E.D. Mich. 2005), *Benton v. Commissioner of Social Security*, 511 F.Supp.2d 842, 849 (E.D. Mich. 2007), and *Brown v. Commissioner of Social Security*, No. 07-15418, 2009 WL 596360, *8-9 (E.D. Mich. March 9, 2009), for the proposition that hypothetical questions with limitations to "unskilled work" or "simple and routine" jobs do not properly reflect the limitations of a person with a moderate deficiency in concentration, persistence, or pace (Pl.'s Brief at 23-24). The present case, however, is distinguishable from the cases cited by Plaintiff. In the present case, the ALJ did not simply ask the VE to consider a person who was capable of unskilled, simple, repetitive, or routine work, but also informed the VE that the person

was restricted due to moderate limitations in his ability to maintain concentration for extended periods (Tr. 42-43).

Plaintiff also asserts that there is a discrepancy between the RFC finding and the hypothetical question, in that the hypothetical question included the requirement that he must be permitted to sit or stand at will and the RFC stated that he must be allowed a sit/stand option, with standing limited to 10 minutes at a time (Pl.'s Brief at 21-22; Tr. 14, 42). The difference between these two limitations, however, is negligible. If a person is permitted to sit or stand at will, then he could choose to sit after standing for ten minutes, if necessary. Plaintiff has failed to identify any error.

> **3.    Plaintiff Has Failed to Demonstrate the Position of Surveillance System Monitor Could Not Be Performed by a Person Limited to Unskilled Work Requiring Simple, Repetitive Tasks.**

Plaintiff next asserts that it was improper for the ALJ to rely on the VE's testimony because there were inconsistences between the VE's testimony and the Dictionary of Occupational Titles with regard to the position of surveillance system monitor (Pl.'s Brief at 24-25). *See* U.S. Department of Labor, Dictionary of Occupational Titles, code 379.367-010 (4th ed. 1991). Specifically, Plaintiff argues that the surveillance system monitor position could not be performed by a person limited to unskilled work and simple, repetitive tasks, as provided in the hypothetical question (Pl.'s Brief at 24-25). Plaintiff notes that, at the hearing, the VE testified in response to his representative's questions that the position required a certain level of concentration (Pl.'s Brief at 24, Tr. 43).

Defendant responds that, although Plaintiff mentions that his representative questioned the VE at the hearing regarding a discrepancy between his concentration limitations and the

requirements of surveillance system monitor, Plaintiff has failed to demonstrate that such a discrepancy exists (Pl.'s Brief at 24-25).

Plaintiff also argues that the surveillance system monitor position is semi-skilled, rather than unskilled, as stated by the VE (Pl.'s Brief at 24). However, the Dictionary of Occupational Titles indicates that the position has a specific vocational preparation (SVP) code of 2, which corresponds to unskilled work. *See* U.S. Department of Labor, Dictionary of Occupational Titles, code 379.367-010 (4th ed. 1991); SSR 00-4p (explaining that an SVP specific vocational preparation code of 1-2 corresponds with unskilled work and an SVP of 3-4 corresponds with semiskilled work).

Plaintiff further claims that a person limited to simple, repetitive tasks could not work as a surveillance system monitor because it required a reasoning level of "3", indicating the ability to apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form and deal with problems involving several concrete variables in or from standardized situations (Pl.'s Brief at 24-25). U.S. Department of Labor, Dictionary of Occupational Titles, Appendix C (4th ed. 1991), 1991 WL 688702. Although Plaintiff cites cases from outside this jurisdiction to support his argument, he identifies no controlling case law providing that the position of surveillance system monitor cannot be performed by a person limited to simple, repetitive tasks due to moderate limitations in the ability to maintain concentration for extended periods.

Simply put, Plaintiff has failed to identify any error in the VE's testimony sufficient to reverse the findings of the Commissioner. Moreover, even if Plaintiff had identified an error in the VE's testimony concerning the surveillance system monitor, it would be harmless because the

VE identified two other positions – sorter and bench assembler – in response to the ALJ's hypothetical question (Tr. 43).

In sum, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decision makers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.  RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, that Defendant's motion for summary judgment be **GRANTED** and that the findings and conclusions of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length

unless, by motion and order, the page limit is extended by the court.  The response shall address

each issue contained within the objections specifically and in the same order raised.


s/Mark A. Randon
MARK A. RANDON
UNITED STATES MAGISTRATE JUDGE

Dated:  November 29, 2010

### *Certificate of Service*

*I hereby certify that a copy of the foregoing document was served on the parties of record on this date, November 29, 2010, by electronic and/or first class U.S. mail.*

*s/Melody R. Miles*
*Case Manager to Magistrate Judge Mark A. Randon*
*(313) 234-5542*